UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Ralph Williams, ) <br> ) <br> Plaintiff, ) <br> vs. ) <br> ) <br> National Union Fire Insurance ) <br> Company of Pittsburgh, PA, ) <br> American International Group, Inc. ) <br> d/b/a AIG Insurance Trust, for the ) <br> Account of Healthextras, ) <br> Healthextras, Inc., Catalyst Health ) <br> Solutions, Inc., Catamaran Health ) <br> Solutions, LLC, Healthextras, LLC, ) <br> Alliant Insurance Services, Inc., ) <br> Alliant Services Houston, Inc., and ) <br> Virginia Surety Company, Inc., ) <br> ) <br> Defendants. ) <br> _____) | Civil Action No.: 6:14-cv-00870-BHH <br><br> **Opinion and Order** |

This matter is before the Court on the defendants' motions to dismiss (ECF Nos. 66, 67, 68, 69) and motion to stay the action pending a ruling on the motions to dismiss (ECF No. 73). For the reasons set forth below, the motions are denied.

## BACKGROUND

The following facts are drawn from the plaintiff's amended class action complaint (the "complaint"), which is the operative complaint in this action. This case involves allegations that the defendants engaged in the fraudulent advertising, marketing, and sale of "group" disability insurance ("the Policy") to South Carolina residents who were not members of any group for which such an insurance product was authorized, and thus the policies were illegal. The plaintiff, Ralph Williams ("the plaintiff" or "Williams"), purchased one of the policies. Williams never made a claim against the policy and is

1

seeking to represent a class of purchasers in a similar position. Indeed, the proposed class specifically excludes any policy holder who actually made a claim against the Policy. The plaintiff further alleges that the defendants knew that the products they were selling were illegal and that the coverage promised by the policies was illusory because there was no intention to pay claims under that purported coverage. The plaintiff also claims that the premium for the disability insurance coverage was unilaterally increased on at least two occasions without the required regulatory approval.

**The Alleged Scheme**

The plaintiff claims that the defendants sent advertising materials to people through a partnership with major credit card companies and banks. The defendants' advertisements featured the late Superman actor, Christopher Reaves, who became a quadriplegic after falling from a horse in 1995. The plaintiff alleges that his acceptance letter included a photograph of Christopher Reeve and a message purportedly from him that stated "[b]ecause lives can change in an instant, as mine did, you should have the additional security for yourself and your family that HealthExtras can provide."

The original marketing flyers offered a One Million Dollar ($1,000,000.00) disability insurance product, called "HealthExtras," "for as little as Nine Dollars and Ninety-Five cents ($9.25)[1] per month or Fourteen Dollars and Fifty cents ($14.50) per month depending on whether the individual added his or her spouse." (Compl. ¶ 44(d).) The plaintiff claims that, in reality, the insurance he was sold was effectively worthless because of a series of harsh and confusing exclusions that conflicted with what was

---

[1] It is unclear whether the discrepancy in the amounts is an error in the complaint or an error in the advertisement.

represented in the marketing materials. For example, although marketing materials contained claims such as,

> "This program provides valuable protection in the event you become permanently totally disabled due to an accident" and

> "You're covered with a $1,000,000 tax-free cash payment if you are permanently disabled as a result of an accident"

(Compl. ¶ 106), benefits would only be provided if the insured suffered a very limited number of catastrophic injuries. These limited injuries included,

> a. loss of both hands or feet; or
> b. loss of one hand and one foot; or
> c. loss of speech or hearing in both ears; or
> d. Hemiplegia; or
> e. Paraplegia; or
> f. Quadriplegia;

(Compl. ¶ 106.) The definitions provided,

> Loss of a hand or foot means complete severance through or above the wrist or ankle joint. Loss of hearing in both ears means total and irrevocable loss of the entire ability to hear in both ears. Loss of speech means total and irrecoverable loss of the entire ability to speak.
>
> Hemiplegia means the complete and irreversible paralysis of the upper and lower Limbs of the same side of the body. Limb(s) means entire arm or entire leg. Paraplegia means the complete and irreversible paralysis of both lower Limbs. Quadriplegia means the complete and irreversible paralysis of both upper and lower Limbs.

(*Id.*) The term "loss" was defined to mean:

> | Loss of: | Percentage |
> |---|---|
> | Sight of Both Eyes | 100% |
> | One Hand & Sight of One Eye | 100% |
> | One Foot & Sight of One Eye | 100% |
> | One Hand or One Foot | 50% |
> | Sight of One Eye | 50% |
> | Hearing in One Ear | 25% |
> | Thumb & Index Finger of Same Hand | 25% |
>
> Loss of a hand or foot means complete severance through or above the wrist or ankle joint. Loss of sight of an eye means total and irrecoverable

3

> loss of the entire sight in that eye. Loss of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.

(Compl. ¶ 110.)

According to the plaintiff, these policy provisions contradicted South Carolina insurance regulations that require that "total disability" be defined no more restrictively "than the inability of the insured to engage in his own occupation during the first year of disability or for the length of the benefit period if less than one year. After the first year of disability, total disability may be defined as the complete inability of the insured to engage in any employment or occupation for which the insured is qualified." (Compl. ¶ 111.) The plaintiff cites cases from other jurisdictions suggesting that even where policy holders actually suffered one of the rare injuries covered under the policy, the policy holders had to sue to get the Defendants to actually pay benefits.

Additionally, the plaintiff claims that a shockingly small percentage of the fees were actually used to provide insurance coverage. The complaint alleges that when monthly premiums for the One Million Dollar HealthExtras disability benefit were $15.95 per month, only $2.24 of that amount was paid to National Union, the purported underwriter of the disability policy. In other words, less than 15% of the premium paid by members for disability coverage actually went to an insurance company.

On top of these significant allegations, the plaintiff alleges that the defendants facilitated the sale of these questionable policies by fraudulently circumventing a provision of South Carolina law intended to prevent such abuse. According to the plaintiff, South Carolina law requires blanket group disability insurance to be marketed and sold to an employer or to a group that has been organized and is maintained in

good faith for purposes other than that of obtaining insurance. The purpose of the rule is to allow the group, as the entity with the insurable interest in its members, to scrutinize the terms of coverage and price of coverage to ensure its members are receiving a good insurance product for a fair price. The plaintiff alleges that in order to get around this limitation, the defendants designated their policy holders as members of a fictitious group and placed them into a "trust" created by the defendants. As the complaint alleges:

> In an extraordinary display of self-dealing, the Defendants created a Trust, which the Defendants own and control, which is called the "AIG Group Insurance Trust, for the Account of HealthExtras." This is a fictitious, illegal and sham Trust that is alter-ego of the Defendants, with premiums collected for the benefit of them rather than a valid group of persons. There is no constitution or bylaws and the HealthExtras members have no voting privileges or representation on any boards or committees. This Trust was created for the sole purpose of selling the HealthExtras disability insurance to consumers with no supervision or oversight.

(Compl. ¶ 82.) Furthermore, because the insurance was a "group policy," the "group" formed by the Catamaran Defendants was the actual holder of the policy and those who purchased coverage were not given a copy of the master policy. The complaint alleges:

> The "Description of Coverage" further indicated that it was a "brief description of coverage available under policy series C11695DBG" and that "[i]f any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540519 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases."
> . . .
>
> Upon information and belief, Master Policy SRG 9540519 concealed from victims of the HealthExtras Scheme that the disability insurance policy they purchased is virtually worthless with no real value to consumers, but the consumer could not readily determine this fact because the Defendants created a sham trust and issued the policy to that "trust" as the "policyholder."

5

(Compl. ¶¶ 91, 100.)

The plaintiff asserts that the insurers who were contracted to underwrite the benefits either misrepresented to the state insurance regulators that the Group Disability Policy was intended to be issued to a valid group under state law or simply failed to apply for approval of the Group Disability Policy.  Consequently, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. (the "Catamaran Defendants") reaped massive profits with its revenues increasing from $5.3 million in 1999 to $44.2 million in 2000.  The plaintiff alleges that the various insurance companies involved in the scheme essentially sold their names and licenses to the Catamaran Defendants for use in the scheme.  As noted, the policies were marketed through a partnership between the Catamaran Defendants and major credit card companies and banks, and the payments for the policies were automatically deducted from the card or account holder's account.

The plaintiff's counsel has brought a number of similar suits in other jurisdictions. Of particular interest are somewhat similar actions in the Eastern Division of North Carolina, No.5:12-cv-113-FL *Petruzzo v. HealthExtras, Inc. et al.*, the Northern District of Georgia, 1:14-cv-309-TWT, *Randy Williams et al. v. National Union Fire Insurance Company of Pittsburg, PA et al*, and the Central District of California, *Waiserman v. National Union Fire Ins. Co of PA, et al.*, No. 2:14-cv-00667-SVW.  The courts in North Carolina and Georgia denied motions to dismiss, *see Petruzzo* at ECF No. 75, *Randy Williams* at ECF No. 98, but the Central District of California granted a motion to dismiss, *see Waiserman*, at ECF No. 84.

## **STANDARD OF REVIEW**

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). To show that the plaintiff is "entitled to relief," the complaint must provide "more than labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. In considering a motion to dismiss under Rule 12(b)(6), the Court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009). Notably, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement" do not qualify as well pled facts.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state "a plausible claim for relief." *Iqbal*, 129 S. Ct. at 1950. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual

7

allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.).

### DISCUSSION

The Court held a hearing on the motions on October 23, 2014. Having carefully reviewed the parties' submissions and considered the arguments presented at the hearing, the Court concludes that the defendants' motions to dismiss should be denied. The defendants argued for dismissal on numerous grounds, but the Court wishes to specifically address three of them in particular.

- The claims are time barred under the statute of limitations;
- The plaintiff lacks standing because he has not alleged a cognizable injury, i.e., he hasn't been denied coverage; and
- The Civil RICO allegations are preempted by the McCarran-Ferguson Act.

Finally, the Court will briefly address the counter-arguments raised by plaintiff's counsel at the hearing.

### 1. Statute of Limitations

The dismissal of a complaint on statute of limitations grounds is itself a rare occurrence because "[a] statute of limitations defense must 'clearly appear on the face of the complaint.'" *Groves v. Daffin*, No. CIV.A. 8:13-00019-JM, 2014 WL 897346, at *2 (D.S.C. Mar. 6, 2014) (quoting *Richmond, Fredricksburg & Potomac R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993)); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (noting that a statute of limitations defense "may be reached by a motion

to dismiss filed under Rule 12(b)(6)" only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint"). Under South Carolina's "discovery" rule, "the statute of limitations begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." *Epstein v. Brown*, 363 S.C. 372, 376, 610 S.E.2d 816, 818 (2005).

The defendants argue that the applicable statutes of limitations have expired because the plaintiff had all the information he needed based on a letter he received in 2004 to put him on notice of the claims he now advances against the defendants. This letter, which was attached to the operative complaint in this action, informed the plaintiff that the holder of his policy was "AIG Group Insurance Trust, for the Account of Health Extras" and advised him that premiums could be increased in the future. The plaintiff questions "how simply notifying [him] that the policyholder was a trust could possibly inform him or put him on notice the policy was in violation of South Carolina law." The defendant responds that "statutes of limitation are triggered upon the discovery of facts forming the basis of a potential claim" and that a plaintiff understanding "the legal import of those facts is of no consequence."

While the plaintiff does not have to understand that the defendants' conduct was illegal to trigger the statute of limitations, simply knowing the name of the trust is not sufficient to put the plaintiff on notice of the scheme he has alleged. At least part of what makes the defendant's alleged conduct actionable is the relationship between the defendants and the illusory nature of the "group." These are "facts," not legal conclusions. The Court finds that knowing the name of the group, without more, would

9

not be sufficient to put a person of common knowledge and experience on notice of the relationship between the defendants and the true nature and purpose of the group. These are, at minimum, the facts necessary to give a reasonable party notice that he or she may have a claim.  The Court cannot determine from the face of the complaint that the plaintiff had notice sufficient to start the statute of limitations in 2004.  Likewise, with regard to the premium increases, which allegedly occurred over an extended period of time after 2004, the Court cannot determine from the face of the complaint and attached exhibits whether the plaintiff was on notice of the increases.  For these reasons, the Court declines to hold that the plaintiff's claims are barred by statutes of limitation.

### 2. Standing

At this stage, the defendants have not contested the plaintiff's allegation that the policies and the nature of the "group" or "trust" were prohibited under South Carolina law, and the Court will accept this allegation for the purpose of this motion only.  Even with that assumption, the defendants argue that the plaintiff lacks standing because he has not alleged that he submitted a claim for benefits and was denied.  Moreover, the defendants argue that even if the policies and group were illegal, they are merely voidable as opposed to void, a position the plaintiff takes as well.  The defendants then reason that because the plaintiff can enforce the policies against the defendants should he suffer a covered injury, the policy is not really worthless as the plaintiff alleges, and the plaintiff lacks standing to sue.

This response addresses only a portion of the harm that the plaintiff has alleged. The plaintiff has not merely claimed that the policies are worthless because they are voidable, but rather that they are voidable because they are essentially worthless and

were marketed, sold, and issued in circumvention of state laws intended to protect consumers from paying for worthless policies. Thus, the harm alleged by the plaintiff is not simply that the policies are unenforceable. Assuming that they are enforceable, they are still essentially worthless because they are, by their terms, so restrictive, that virtually no one will ever suffer an injury covered by the policy.

The defendants also argued that the Court should not "take out a blue pencil" and weigh in on whether the plaintiff made a good deal" or act as "a forum for debating the fairness of the policy." (Tr. at 33:19 – 34:4.) The Court would agree that typically the fact that a party pays more for something than it is worth does not give rise to a cause of action. *See e.g.*, *Ryan v. Weiner*, 610 A.2d 1377, 1381 (Del. Ch. 1992) ("It is [the] general rule, recited by courts for well over a century, that the adequacy or fairness of the consideration that adduces a promise or a transfer is not alone grounds for a court to refuse to enforce a promise or to give effect to a transfer."); *F.D.I.C. v. Hartford Acc. & Indem. Co.*, 97 F.3d 1148, 1151 (8th Cir. 1996) ("A court must not impose its own concept of fairness under the guise of construing a contract."). Here, however, the allegation is not simply that the defendants convinced the plaintiff and others similarly situated to make a bad deal, but that they fraudulently circumvented a provision of state law intended to protect consumers, including the plaintiff.

Notably the Northern District of Georgia found that the insurance policies in question were valid and enforceable, but then declined to grant the motion to dismiss. *See Williams et al. v. National Union Fire Insurance Company of Pittsburg, PA et al.*, No 1:14-cv-309-TWT, ECF No 98 at 7 (N.D. Ga. Sept. 4, 2014) ("The Defendant National Union argues that the Plaintiffs suffered no harm because they got the insurance that

they paid for and never made any claims for disability benefits. This may be true, but it cannot be determined as a matter of law from the face of the pleadings."). *But see Waiserman v. National Union Fire Ins. Co of PA, et al.*, No. 2:14-cv-00667-SVW, ECF No. 84 at 6-7 (C.D. Cal. Oct. 24, 2014). Like Judge Thrash, this Court is uncomfortable concluding as a matter of law that the plaintiff suffered no harm at this stage.

### 3. McCarran-Ferguson

Finally, the defendants argue that the civil RICO allegations are preempted by the McCarran-Ferguson Act. The McCarran-Ferguson Act provides that no Act of Congress "shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ." 15 U.S.C. § 1012(b). The Supreme Court held in *Humana, Inc. v. Forsyth*, 525 U.S. 299, (1999) that for a federal law to be preempted by McCarran-Ferguson: "(1) the state law in question must be enacted for the purpose of regulating the business of insurance; (2) the federal law must not be specifically related to the business of insurance; and (3) the federal law must "invalidate, impair or supersede" the state law in question. *Id.* at 307.

Here, the first two elements of preemption are satisfied because South Carolina's insurance code was clearly enacted for the purpose of regulating insurance and RICO is not specifically related to the business of insurance. Thus, the question is whether the application of RICO in this case "invalidates, impairs or supersedes" South Carolina insurance law. To answer that question, the Supreme Court has said that courts must make a fact-specific, case-by-case inquiry that considers whether the application of RICO would "frustrate any declared state policy or interfere with a State's administrative regime." *Id.* at 310. The defendants argue that it would because South Carolina's

insurance code gives the Director of Insurance and the Attorney General the authority to police violations of the insurance code and, unlike the Nevada statute at issue in *Humana*, does not specifically authorize a private cause of action.

The plaintiff points out that the Fourth Circuit found no McCarran-Ferguson preemption in a case involving Virginia insurance law, which like South Carolina law, does not authorize a private cause of action.  *See American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004).  In response, the defendants argue that the plaintiff is ignoring other significant differences between Virginia and South Carolina law, specifically the fact that "the South Carolina Insurance Code does not merely fail to expressly provide for private rights of action for violations of the Code, but . . . contains *numerous* provisions that manifest a clear legislative intent to statutorily limit the role of private parties in the enforcement of the Code to their administrative remedies, committing responsibility for the interpretation and enforcement of the Code to the South Carolina Director of Insurance."  (ECF No. 84 at 12.)

At the hearing, the Court asked the plaintiff's counsel to respond to this argument.  Counsel declined citing the fact that he had just returned from an oral argument in California.  The plaintiff's arguments on the McCarran-Ferguson issue are incomplete and inadequate.  The Court is, however, hesitant to issue a potentially broad ruling that the McCarran-Ferguson Act preempts RICO actions against insurers committing gross violations of the insurance regulations that this state has enacted to protect its consumers.  The plaintiff is hereby directed to submit thorough supplemental briefing on this issue within thirty (30) days of this Order.  The defendants will then have 14 days to file any desired response.  If this issue is not adequately addressed in the

plaintiff's supplemental briefing, the Court will dismiss the RICO claims. The Court finds the remainder of the defendants' arguments to be insufficient to support the dismissal of this action at this time. The defendant may, however, re-raise these arguments on a motion for summary judgment once the record has been more thoroughly developed.

**Plaintiff's Counter-Arguments at the Hearing**

While the Court is ruling for the plaintiff in substantial part, it feels the need to respond to arguments that plaintiff's counsel relied upon at the hearing. Counsel made the following three points in response to the defendants' arguments.

- "No one, and no defendant, has ever said – nor can they – that all of the allegations which are, in my opinion, pretty extraordinary, are not true. No one's ever said that. You never heard that from anyone." (*See* Tr. at 26:16-20.)

- "Bad behavior rewarded is always repeated." (*Id.* at 30:5-6).

- "[T]his is an extraordinary violation of public policy. An extraordinary violation of public policy. And so it shouldn't surprise anyone that the plaintiffs are asking for an extraordinary remedy." (*Id.* at 31:25 – 32:1-4.)

With regard to the first point, on a motion to dismiss the well-pleaded allegations of a plaintiff's complaint must be accepted. Thus, it is futile and inappropriate for defendants facing a motion to dismiss to focus their efforts on denying or disproving the facts alleged. With regard to the second point, the Court agrees, which is precisely why it has hesitated to allow the plaintiff to proceed after making such an argument. With regard to the final point, not every violation of public policy creates a private right to damages. The Court has ultimately concluded that dismissal of the plaintiff's claims would be premature. That being said, much more will be required for the plaintiff to survive a motion for summary judgment, and the defendants may re-raise the

arguments presented in their motion to dismiss once the record has been developed. Outrageous allegations are not a substitute for legal analysis; the plaintiff will need to do more.

## CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss (ECF Nos. 66, 67, 68, 69) and motion to stay the action pending a ruling on the motions to dismiss (ECF No. 73) are denied. The plaintiff is ordered to submit supplemental briefing on the issue of whether the McCarran Ferguson Act preempts the plaintiff's RICO claims within thirty (30) days of this Order. The defendants will then have 14 days to respond if they wish to do so.

**IT IS SO ORDERED.**

                                              s/ Bruce Howe Hendricks
                                              United States District Judge

March 31, 2015
Greenville, South Carolina